Adams v. Slater.

WILLIAM ADAMS

V.

ROBERT P. SLATER ET AL.

1. STATEMENT.—The plaintiff owned a mill on the DesPlaines river with a dam called Adams' dam, and he and his grantors had been in possession of the same since and prior to 1852. The grantors of plaintiff were P. A. & O. H. Haven. The Ill. & M. Canal, after following the channel of the river for some distance, left it about half a mile above Adams' dam. The improvement known as the deep cut was completed in 1871, since which time more water was introduced into the summit level of the canal above Adams' dam than was required for navigation purposes or the use of the canal, and

Adams v. Slater.

twice as much as flowed over the dam before. The defendants erected a mill on the western bank of the canal, on the Cannahon level, half a mile southwest of plaintiff's dam, below where the canal leaves the river, and built a tunnel under the canal and put in water wheels and drew water from said level and discharged it into the river below plaintiff's dam so that the use of said water was wholly lost to said plaintiff; but for such diversion all of said water would naturally have flowed into the river to the plaintiff's dam and water wheels. The use of said water from the canal by defendants was under a lease from the Canal Commissioners. The Havens, the grantors of plaintiff, while owners of Adams' dam in 1848, sued the trustees of the canal to recover damages for diverting the water of the river from said dam into the canal, which suit was settled, damages paid, and an agreement made with the trustees that the water of the DesPlaines might be diverted from Adams' dam for the purpose of supplying the canal for the purpose of navigation.

2. RIPARIAN OWNER—WATER COURSE—POWER TO DIVERT.—The Supreme Court before the settlement in the suit referred to, reported 5 Gilman, 548, and 11 Ill. 554, held that the Canal Trustees could not divert the water of the DesPlaines river from Haven's Mill to their damage without making compensation, and thereby relieved this court from inquiring into the power of the trustees to divert the water.

3. RIPARIAN PROPRIETORS—THE RIGHTS OF THE HAVENS.—That the law declared the Havens as riparian owners were entitled to the use of the water as it was accustomed to flow in the bed of the river.

4. RIGHT TO DIVERT THE WATER UNDER THE RELEASE.—That the Havens conveyed the right to the Trustees to divert the water for the purpose of navigation only from the Adams' dam, which bound them and their assignees, and the trustees could not divert the water for any other purpose, neither could the appellees, their grantees.

5. NO RIGHT TO DIVERT THE AMOUNT ADDED ABOVE.—That under the contract the trustees had no right to divert water from the plaintiff's mill, except for the purposes of navigation at the point where the canal leaves the river the same amount of water they had added to it by the construction of the canal.

6. THE PURPOSE FOR WHICH WATER INTENDED MATERIAL.—That if the canal authorities provided a surplus of water on the summit level for the purpose of supplying the Channahon level, and made use of the DesPlaines river as a mere conduct to convey the water from one level to another, then, perhaps, under the decisions cited, they might have the right, so far as appellant is concerned, to withdraw such surplus water from the river above plaintiff's mill, as in such case the decisions appear to hold that the possession of the water would be still retained by them for their own use. But if such water be discharged into the river as a means of getting rid of it, then even under these authorities it becomes a part of the river itself, and subject to the like uses and governed by the same rules as the original waters of the stream.

7. WHEN WATER TREATED AS ABANDONED.—That the water discharged into the DesPlaines river at Norton's mill must be considered as

abandoned by the canal authorities, and becoming thereafter a part of the waters of that river, and subject in its flow to the uses of the lower riparian proprietors. The right to the use of water continues only with its possession, and once lost can never be reclaimed.

8.  DIVERSION—COMMISSIONERS NO AUTHORITY.—The defendants diverted the water from plaintiff's mill, and justified the act as they claimed under the authority of the Canal Commissioners. They had no authority themselves to divert the water for the purpose used, and could confer none on the defendants.

APPEAL from Circuit Court of Will county; the Hon. Josiah McRoberts, Judge, presiding. Opinion filed April 6, 1881.

This action was commenced by the appellant against the appellees, to recover damages for diverting the water of the DesPlaines river from the mill of the plaintiff. The cause was submitted to the Court, and a judgment for costs rendered against the plaintiff, and he appeals to this Court. The facts agreed upon and certified to by the Court as being established upon the trial below are as follows :

That the plaintiff, at the time of the commencement of this suit, was possessed as the owner of lots 1, 2, 3 and 4, in block 45; and lots 1, 2, 3, 4, 5, 6, 7 and 8, in block 57; and lots 1, 2, 3, 4 and 6, in block 62, all in the school section addition to Joliet, in Will county, Illinois; said addition comprising the whole of section 16, town 35, range 10, east, 3d P. M.; and that said plaintiff and his grantors have been in possession of said premises continuously since 1852, and prior thereto; and that said grantors to plaintiff were Philo A. and Orlando H. Haven; that said premises are located on the DesPlaines river, a natural water course, running through said section 16; that a dam, herein called Adams' dam, is and has been standing across said river since prior to 1852; and that said premises have been used continuously to the date of trial by plaintiff and his grantors for mill purposes, deriving the power therefor from said DesPlaines river.

That said plaintiff now and for many years has located on said premises mills, propelled by water-power derived from said river, and has, and had at the date of the diversion of

Adams v. Slater.

water complained of, located on said premises six wheels, four of which are in place to be used, and which are reasonably fitted to use the water in the river, and do not require, to put them in use, any unreasonable detention or employment of the water flowing in said river.

That the location of said premises, with reference to the Illinois and Michigan Canal, and the DesPlaines river, in the City of Joliet, is correctly shown by the map, marked "A," which shall be sent up with the record herein, and that the location and course of the DesPlaines river, and the Illinois & Michigan Canal, from the North line of Sections 22 and 23, in town 35, North Range 10, East (being the Town of Lockport), to the South line of Section 16, Town 35, Range 10, East, being the Town of Joliet, with the locks, levels and dams of said canal in said distance, the dam of said Adams, and the structure of said defendants on said canal below Ad ams' dam, are correctly shown by the map, marked "B," to be sent up with this record.

That said canal was opened for navigation in the spring of the year, 1848.

That the summit division of said canal terminates at Lockport Ill. on Section 23, Town 36, Range 10, and was improved by the city of Chicago, so as to make a continuous level drawing water from Lake Michigan from the terminus at the south branch of the Chicago river to Lock No. 1, aforesaid, under the Act of the General Assembly of date February 16, 1865 ; that said improvement was completed about May 1, 1871; that the State of Illinois, by Act of the General Assembly, assumed charge of said improved level in the year, 1871, by act of date, October 20, 1871, and has since controlled the same.

That from dam No. 2, in Joliet, south, the canal level is known as the Channahon level; that all the water which is put into said level for any purpose, is drawn from the pool, formed by dam No. 2, at Joliet, above plaintiff's dam, and since the building of said canal and its opening in 1848, until the completion of the structures of defendants, no water had ever been drawn from said level, or been put into the same, except as required for navigation purposes, nor had any water been used or leased on said level.

That there is more water introduced into the summit level of said canal by reason of the improvement known as the deep cut above referred to, than is required for navigation purposes, and more than is required for the purposes of the canal between locks One and Two, Two and Three, and Three and Four, on said canal between Lockport and Joliet that the use of such surplus water is leased to Norton & Co. at Lockport, so far as they may require, and the balance is discharged by a spillway ; both the water used by Norton & Co. and that discharged by said spillway, being conducted by a race shown in Map 1, from the hydraulic basin, connected with the canal, also shown on said map, to the DesPlaines river, as shown on said map, at a point in Section 23, in said town, and from thence mingled with other water of said river, follows the bed of said stream through Sections 22, 23, 27 and 34 in the town of Lockport, and partially through Section 3, in the town of Joliet, as shown by said map, to a point where said canal effects a junction with said river.

That from said point in section 3, aforesaid, where said junction is made, to dam No. 2, in Joliet, said canal is contained within artificial banks, or walls of stone, but comprises the original bed of said river, using the same, and leaving said river as shown on said map at dam No. 2.

That there is a mill site, and mill, on said river, Sec. 23, in Lockport, and had been for many years, and that from the point on Sec. 23, where said surplus water is discharged, to the point in Sec. 3, in Joliet, where the canal enters into the bed of said river, there is no connection between said canal and said river; and no structures, works or improvements of any kind were ever placed on said river, or any control exercised over the same by any canal authorities, or the State, for any purpose; that said waste-weir is never used except in case of high water and floods, or when it is necessary to draw off the water from the level, for the purpose of repairs, there usually being no more water than is utilized at Norton's Mills.

That the amount of water discharged into the DesPlaines river at Lockport, from the summit division of said canal, through said spillway and Norton & Co.'s race, is about 25,000

Adams v. Slater.

cubic feet per minute, that the amount of water required for navigation purposes of said canal, from lock No. 1 to dam No. 1, is about 12,000 cubic feet per minute; that the amount of water required for navigation purposes of said canal from dam No. 1 to the end of the Channahon level is about 3,300 cubic feet per minute, and the amount required for navigation purposes on the Channahon level alone is about 2,800 cubic feet per minute.

That since the completion of the said deep cut, and the turning of such surplus water into said river at Lockport, the amount of water flowing over Adams' dam at Joliet before the diversion of the water herein complained of, was greater by two-thirds as estimated, than the amount flowing over said dam prior to said deep cut improvement, and that the amount of water passing over Adams' dam, since the diversion complained of, is double the amount which passed over said dam before the completion of the deep·cut.

That the season during which said canal is·open for navigation on said Channahon level, is generally from March 25th to November 25th in each year.

That defendant's premises are located on the berme, or western bank of said canal, on said Channahon level, about half a mile southwest of plaintiff's dam; that defendants built a tunnel under said canal, put in water wheels, and at the date of commencing said suit had been drawing water from said Channahon level, of said canal, to the extent of from 6,000 to 8,000 cubic feet per minute, to operate their mill; discharging the same into the DesPlaines river below the plaintiff's dam, and at a lower level on said river than said dam, so that the use of said water was wholly lost to plaintiff; that, but for the diversion of said water from the pool above dam No. 2, of the Illinois & Michigan canal, into the Channahon level of said canal, and for such use by defendants, all of said water would have naturally flowed in the banks and bed of said river to plaintiff's dam and water wheels, and could have been used by him.

That such use of said water from said canal, by said defendants, is by virtue of a lease for such purpose, executed to said

defendants by the Canal Commissioners of the State of Illinois.

That said mill of defendants and said structures for using said water had been in use at the date of the trial, about two years, and that plaintiff could have used, and had machinery wherewith to use all the water so used by defendants, and that the damage to plaintiff is from $800 to $1,000 per annum; that plaintiff's damage to date of trial is from $1,600 to $2,000.

That the course of said canal, as shown by said maps, is as originally laid out and completed in 1848.

That said Philo A. and Orlando H. Haven, the plaintiff's grantors, while in possession of said premises, commenced suit against the trustees of the Illinois & Michigan canal, about the year 1848, to recover damages for the diversion of the Des-Plaines river into said canal, and away from said dam; and that said suit is the identical one referred to and decided in the 5th Gilman Reports, page 548, and in the 11th Illinois Reports, page 554, and is of and concerning the same dam that plaintiff is now in possession of.

That before final judgment in said last named suit, and on, to wit: the 22nd, day of August A. D. 1853, an agreement in writing was executed between said Philo A. and Orlando H. Haven, of the one part, and said trustees of the Illinois & Michigan canal of the other part, in words and figures as follows, to wit:

" Whereas, a suit has been, and is now pending at the instance of Philo A. Haven and Orlando H. Haven, against the board of trustees of the Illinois & Michigan canal, in the Circuit Court of Will county, Illinois, in consequence of alleged damages to a certain mill owned by said Philo A. Haven and Orlando H. Haven, situated on the DesPlaines river at Joliet Will county, Illinois, occasioned by diverting the water of said river from said mill and applying it to the use of the Illinois & Michigan canal above said mill; and, whereas, the said board of trustees and the said Philo A. Haven and Orlando H. Haven, being mutually desirous of avoiding further litigation,

" Therefore, we the said Philo A. Haven and Orlando H. Haven, for and in consideration of the sum of three thousand

Adams v. Slater.

and sixty dollars to us paid by the said board of trustees of the Illinois & Michigan canal, the receipt whereof is hereby acknowledged, do hereby release and forever discharge the said board of trustees and their successors in office, from all actions, rights of action, and all claims arising out of any damages heretofore, now, or hereafter, to be sustained by us, by reason of the use of the waters of said DesPlaines river, for the purpose of supplying said canal, in the manner the same is now supplied at the feeder at Joliet. In further consideration of the said sum of three thousand and sixty dollars, herein expressed to have been received by us, we hereby remise, release, and forever quit-claim to the board of trustees and their successors in office, and to the State of Illinois, whenever said canal shall revert to said State, the right to use and appropriate the water of the said DesPlaines river at the feeders at Joliet, below guard lock No. 1, for supplying the said canal for the purpose of navigation in the same manner the water in said river in connection with other feeders is now used for supplying said canal.

"We further agree that when, at any time, the superintendent or other person having charge of said canal shall desire to reduce the quantity of water above our said mill-dam, for the purpose of repairing said canal, its banks or other appurtenances at any point between our said mill and the dam across said river at said feeder; that said superintendent or other person having charge of said canal may reduce the water above said mill-dam, provided the water at our said mill-dam shall not be reduced lower than the top or comb of our said mill-dam, which may be done by opening the waste-ways at the west end of said mill-dam, which shall be closed by said superintendent, as soon as said repairs can be completed, and shall not be opened except for such repairs as aforesaid, nor remain open more than for the period of one week at any one time without such compensation as may be agreed upon by any two persons to be selected by us for that purpose.

We further agree to dismiss all suits now pending at our instance against said board of trustees in the Circuit Court of Will county, Illinois, and pay all costs of court that may

remain unpaid, at the time said suit or suits shall be dismissed.

"In witness whereof the said Philo A. Haven and Orlando H. Haven, have hereunto set their hands and seals this 22d day of August, 1853.

"PHILO A. HAVEN,     [SEAL]

"By O. HAVEN, his Attorney-

in-fact.     [SEAL]

"ORLANDO H. HAVEN.     [SEAL]"

And that the sum of money mentioned in said agreement was paid and receipted for, said receipt being in words as follows:

" $3060.

"Received, Lockport, Aug. 22d, 1853, from David Leavitt, Treas. for the Board of Trustees of the Illinois & Michigan Canal, by the hands of William Gooding, secretary, the sum of Three Thousand and sixty dollars, in full, on settlement of our claim for damages against the Board of Trustees of the Illinois & Michigan Canal.

"PHILO A. HAVEN,

"By O. H. HAVEN, his Attorney-

in-fact.

"O. H. HAVEN."

The following is a copy of map " B " sent up with the record, by the aid of which the case can be better understood. As the location of plaintiff's mill-dam is sufficiently shown thereon. map " A " is not given.

Adams v. Slater.

## MAP "B."

Messrs. GARNSEY & KNOX, for appellant ; that there is no property in the water of a water-course ; the only property right is, the right to the use of the water as it passes through or by each owner's land, cited 3 Kent Com. *439 ; Angell on Water Courses, § 95; Evans v. Merriweather, 3 Scam. 492 ; Batavia Manuf. Co. v. Newton Wagon Co. 91 Ill. 239 ; Washburn on Easements, 214; Havens v. Canal Trustees, 11 Ill. 557; Plumleigh v. Dawson, 1 Gilm. 544.

A lower riparian proprietor has the right to the use of all water which may be added to a stream by a higher proprietor; Tourtlette v. Phelps, 4 Gray (Mass.) 376 ; Webb v. Portland Manuf. Co. 3 Sumner, 189 ; Swindon Water-works v. W. & B. Canal Co. 14 Moak, 86 ; Eddy v. Simpson, 3 Cal. 249.

The object of passing the water of Lake Michigan through the Summit Division of the canal was to purify the Chicago river : Laws of Ill. 1865, pages 83 and 84.

As to the right to take out as much water as a party puts in: Wood v. Wood, 3 Exch. 748 ; Angell on Water Courses, Sec. 153 ; Elliott v. Fitchburg R. R. Co. 10 Cush. 191.

Appellant stands in the situation of a prior occupant of a mill site, and is entitled to have the water flow to him : Cary v. Daniells, 8 Met. 478 ; Angell on Water Courses, § 135.

As to the construction to be put upon the agreement to use the water for the purpose of navigation only : Dewitt v. Harvey, 4 Gray, 486 ; Garland v. Hodson, 46 Maine, 511.

The sole object of the construction of the canal was to provide water communication between Lake Michigan and the Illinois River : Scates Comp. 887 ; Acts of Congress 1827, Id. 888 ; Sec. 1, Act 1829, Id. 889; Sec. 2, Acts of 1836, Id. 893.

The acts relating to the Ottawa water power are the following : March 2, 1837, Scates Comp. 896 ; July 21, 1837, Id. 902 ; March 4, 1843, Id. 905 ; February 14, 1851, Id. 924.

The Supreme Court has decided that an action of this character will lie : Turney v. Smith, 86 Ill. 391.

Mr. G. D. A. PARKS, for appellees; that there are no decisions which hold when A. employs that part of No. 1, which belongs to him simply as a convenient medium for transmitting

the waters of No. 2 across a channel which he has constructed for his own purpose on the opposite side that B. as against A. acquires any legal right whatever in such extra water, cited Whittier v. Cacheo Manuf. Co. 9 N. H. 454 ; Butte v. Vaughn, 11 Cal. 143 ; Burnett v. Whitesides, 15 Cal. 35 ; Embury v. Owen, 6 Exch. 360 ; 2 Washburne on real property, 329 ; Hoffman et al. v. Stone et al. 7 Cal. 46 ; Society for Establishing Manufactures v. Morris Canal Co. 1 N. J. Eq. Rep. 157.

The following authorities relate to artificial water courses : Wood v. Waugh, 3 Exch. 748 ; Angell on Water Courses, Sec. 433 ; Broom's Leg. Max. 375.

That it was not an actionable injury for the Commissioners to divert the water, and if not for them, it was not for their grantees : 2 Hilliard on Torts, 156 ; Gidley v. Palmerston, 7 E. C. L. 438; Hodgson v. Dexter, 1 Cranch, 345.

That the plaintiff's claim was barred by the Haven release : Canal Trustees v. Haven, 5 Gilm. 548.

PILLSBURY, J.    By the decision in Canal Trustees v. Haven, 5 Gilm. 548, we are relieved of the necessity of inquiring into the powers of the canal authorities to use the water of the DesPlaines river to supply the canal at the Joliet feeder.    It was there held that they could not divert the water from the Havens' mill to their damage without making compensation. Before the proceedings in that cause were concluded by the assessment of damages, the matter in dispute was compromised, and the trustees, by purchase, obtained the right to divert the water of the river into the canal, as evidenced by the agreement in writing referred to, and recited in the statement of facts.    No suggestion is made by counsel that this contract at its inception was not binding between the parties to it.    Being valid between them, and continuing in its character relating to the future use of the water in the river, it is equally binding upon the successors of the trustees and the grantees of the Havens, and therefore the rights of the parties hereto to such water, do not depend so much upon the principles of law applicable to riparian proprietors, as upon the terms of the

contract, in and by which their interests therein, by their priv-
ies in contract and estate, have been defined and limited.

In so far as the canal trustees acquired the right, by the
purchase from the Havens, to divert the water of the Des-
Plaines, they can use and appropriate it if necessary for the
purposes of the grant, to the entire exclusion of the appellant,
the grantee of the Havens, he having taken the mill and prem-
ises charged with such burden.

When relying upon their rights as riparian owners, the law
declared that they were entitled to the use of the water as it
was accustomed to flow in the bed of the river, but having
seen proper, for a sufficient consideration, to convey to the
trustees the right to divert the water from their mill by with-
drawing it from the stream above their mill for canal purposes,
their grantee, the present appellant, can only use the water of
the river subject to such grant. The canal trustees, on the
other hand, having no right to divert the water from the river
channel to the injury of the Havens as riparian proprietors, by
accepting the contract or grant, become bound by its terms,
and to the extent of the grant, but no further, became entitled
to the exclusive use of the water. The proper construction of
the contract or grant in this view, in determining the rights
of the parties to this cause, becomes of paramount importance,
the appellees claiming to be lessees of the canal authorities,
and of course having no greater rights than their lessors.

In construing contracts courts will examine their provisions
in the light of the circumstances surrounding the parties and
the subject-matter when they are made. The canal was com-
pleted in 1848, the construction being the same then as now,
excepting the improvement made on the summit level by the
city of Chicago, which was done at a later period. We think
it fairly deducible from the admitted facts, if not stated in so
many words, that the hydraulic basin referred to as being at
Norton's Mills, was a part of the original construction of the
canal, and that before the deepening of the summit level, the
surplus or waste water from that level was turned into the
DesPlaines river in the same manner it has been since,
although in much less quantities. At the same time all the

Adams v. Slater.

water passing through the canal from Lock No. 1 entered the river above the mill-dam of the Havens, at the junction of the canal with the river. The volume of the water of the river was thus increased by all the water running in the canal, and the right of the trustees to divert from the stream at guard lock No. 1, the point where the canal leaves the river, the same amount of water they had added to it, by the construction of the canal, was necessarily involved in the suit referred to in the 5th Gilm. and 11th Ills. had such claim been insisted upon, and must have been considered by the parties in the settlement of that controversy, when the contract was made adjusting their respective rights and interests in the water of the river. With these facts within the knowledge of the parties, and as we must conclude, taken into consideration by them in adjusting the matters in dispute, it would seem that the trustees treated the right to the exclusive use of the water of the river, increased by their own works, so far as it should be necessary to appropriate it for the purpose of navigation, as a sufficient consideration for the relinquishment upon their part of any claim to use or divert any portion of the water in the stream from whatever source derived, not required by them for such purpose. From the completion of the canal to the execution of the contract, the water was taken from the river at the feeder in Joliet, for the purpose of navigation only, as admitted by the statement of facts, and the agreement refers to such condition when it releases and discharges the trustees from all claim of damages that had or should be sustained by the Havens by reason of the use of the water of said river in supplying said canal in the manner the same was supplied at that time at said feeder. The words of the grant are equally specific and guarded.

They "remise, release, and forever quit-claim, to the board of trustees and their successors in office, and to the State of Illinois, whenever said canal shall revert to said State, the right to use and appropriate the water of the said DesPlaines river at the feeders at Joliet below guard lock No 1, for supplying the said canal for the purposes of navigation in the same

manner the water in said river, in connection with other feeders is now used for supplying said canal."

There can be no doubt, from the language employed, that it was the real intent of the parties, by said grant to fix and determine as definitely as it was possible to do, the quantity of water that the canal trustees could rightfully use and appropriate to the exclusion of the Havens. It is carefully limited to such a quantity as would be necessary in connection with other feeders to supply the canal for navigation purposes.

The phrase " in connection with other feeders," was not intended by the parties, as counsel seem to suppose, as extending the *uses* for which the water of the river could be appropriated, but to more effectually limit the amount that could be diverted for the purposes of navigation. The true meaning appears to be, that the trustees could withdraw from the river the additional quantity of water required for navigation purposes, beyond that supplied to the canal by the other feeders, then in use.

It is contended, however, that owing to the improvement in the summit level, by which the waters of Lake Michigan are caused to flow through the canal into the DesPlaines river, by way of the discharge gates at Norton's mills, double the quantity of water runs over the dam of appellant since the diversion now complained of, than did before such improvement was made, and the appellant instead of being damaged is in reality benefitted; and that the canal authorities can rightfully take from the waters of the river, the like quantity and make use of the same for any purpose they may desire.

Several cases have been cited by counsel as sustaining such position, and without controverting the doctrine therein announced, we are of the opinion that under the facts of this case the right contended for does not exist, even under the authorities cited.

Tested by the rule of law declared in those cases, disregarding for a moment the contract in evidence, the correctness of the conclusion of counsel depends upon the intention with which the water was turned into the river from the summit level. If the canal authorities, provided a surplus of water on

the summit level for the purpose of supplying the Channahon level, and made use of the DesPlaines river as a mere conduit to convey the water from the one level to the other, then, perhaps, under said decisions they might have the right so far as appellant is concerned, to withdraw such surplus water from the river above plaintiff's mills, as in such case the said decisions appear to hold that the possession of the water would be still retained by them for their own use.

If however, such water be discharged into the river as a means of getting rid of it, it not being required for the use of the canal, then even under the authorities referred to, it becomes a part of the river itself and subject to like uses and governed by the same rules as the original waters of the stream.

The object of the canal authorities in turning the water into the river at Norton's Mill, is fully disclosed by the statement of facts. The case states "that there is more water introduced into the summit level of said canal by reason of the improvement known as the deep cut, than is required for navigation purposes, and more than is required for the purposes of the canal between locks one and two, two and three, and three and four, on said canal between Lockport and Joliet; that the use of such surplus water is leased to Norton & Co., at Lockport, so far as they may require, and the balance is discharged by a spillway; both the water used by Norton & Co. and that discharged by the spillway, being conducted by a race shown in the map, from the hydraulic basin, to the DesPlaines river, etc. It is equally clear that such water so discharged at Norton's Mills was not required for the purposes of navigation on the Channahon level, as it is stated that the requirement of that level is but 2800 cubic feet per minute, while the upper level required 3300 cubic feet per minute, and of course discharging that amount into the river above the Channahon level. This improvement was made by the city of Chicago, for the purpose of creating a current from the lake and Chicago river, through the summit level of the canal, thereby establishing a system of drainage for the city, that it was hoped at the time would be adequate to the wants of the

people, and in order to maintain the necessary current it was indispensible that an outlet should be provided at the foot of the summit level for the discharge of the water flowing into the canal at the city, for if the water was to be retained by the lock, the very object of the enterprise would be defeated.

The means for the discharge of this surplus water was found by turning it through the gates at Norton's Mill, into the DesPlaines river, and from thence into the Illinois river.

From the admitted facts and from the circumstances surrounding the making of the improvement, or deep cut so-called, the conclusion is rendered certain, that the said improvement was not made for the purpose of supplying the canal below guard lock No. 1, with water for canal purposes, but for the purpose alone of improving the drainage facilities of the city of Chicago by making the canal an outlet for its sewers by way of the DesPlaines river. All the facts and circumstances negative the idea that it was a part of the plan of the city in making such deep cut, or of the state in allowing the city to do so, to create a water-power on the Channahon level, or to furnish water for canal purposes. It is very clear to our minds that the water discharged into the DesPlaines river, at Norton's Mill, under such circumstances must be considered as abandoned by the canal authorities, becoming thereafter a part of the waters of that river and subject in its flow to the uses of the lower riparian proprietors.

The right to the use of water continues only with its possession and once lost cannot be reclaimed.

The construction that we have given to the contract between the Havens and the canal trustees, also furnishes a sufficient answer to the position of the appellees. There is nothing in the statement of facts that causes us to suppose more water is now required for canal purposes on the levels below lock No. 1, at Lockport, than was necessary for the same purpose when the contract was delivered and accepted, and the facts admitted show that at least 500 cubic feet per minute found its way into the river from the upper levels of the canal more than was diverted from the river at guard lock No. 1, for supplying the Channahon level, and of course,

this amount followed the course of the stream to the mill of the plaintiff. As we have said, the right to such surplus water must have been considered by the parties in their settlement, and the canal trustees, knowing that the quantity of water turned into the river by the canal, might and probably would be increased or diminished by changes in the seasons, causing high or low water in the feeders supplying the upper canal, or from other causes that might arise, such as the completion of the canal according to the original plan, which plan counsel say, was abandoned only for the time being, saw proper, in consideration of the prior right to appropriate all the water of the river necessary for navigation, to accept a grant limiting their right to thus use and appropriate the water to the quantity required for such purpose.

If they had the power to enter into such contract (and their authority to do so is not questioned by counsel), and they have by such contract agreed to restrict themselves in their use of the waters to a certain quantity, we are aware of no principle that will allow them to divert from the river a greater quantity, to be used by them for a purpose entirely different from that contemplated by the contract.

It is admitted that the appellees have withdrawn from the Channahon level of the canal, which is supplied from the river above plaintiff's dam, from 6000 to 8000 cubic feet of water per minute for the two years preceding the trial, using the same as motive power for their mill, discharging it form their wheels into the river below plaintiff's mill; that plaintiff had the machinery wherewith to use such water, had it not been so taken by defendants, and that in consequence of such diversion of the water the annual damage to the plaintiff was from $800 to $1,000, and up to time of the trial the damage to the plaintiff was from $1,600 to $2,000.

It is urged that the appellant has no remedy for such damages in a court of law; as the canal commissioners are not liable to be sued, and the appellees being their lessees are entitled to like immunity.

It is true the appellees take the water from the canal and river by virtue of a lease from the canal authorities, by its

terms giving them the privilege or right to use such water for mill power, but it is clear that if the commissioners could not lawfully divert such water, so taken and used by the appellees, they could confer no right upon the appellees so to do. The act if done by them would be none the less wrongful because, being officers of the state, public policy does not permit them to be sued. It is not perceived how they can clothe a party who voluntarily commits a trespass for his own benefit, even if done by their permission or command, with their official robes or invest him with the immunities claimed to be granted to them as such officers by the statute. The appellees are not in any sense the servants of the commissioners, engaged by them to assist in the performance of their duties as officers of the State, but in all their acts are working for their own gain and profit.

Whether a suit at law could be maintained against the canal commissioners as such, for diverting the water of the river for canal uses is a question not necessarily raised upon this record, and for that reason we decline to discuss it.

The defendants below for their own gain and profit, took from the river by means of the canal large quantities of water that otherwise, as admitted, would have naturally flowed to the mill of the plaintiff, thereby causing the damage to him.

This act the defendants justify under the authority of the canal commissioners. The canal commissioners not acquiring the right to thus divert the water by the grant to them, and having no other prior right so to do, the justification relied upon by the defendants, fails.

We do not, however, consider that such diversion of the water is caused by the act of the commissioners. They gave the defendants the right and privilege so far as they were concerned to so take and use the water of the river, but the defendants were not obliged to accept the lease nor to act under it. If they had not erected their mill and taken the water from the canal to run their machinery no injury would have occurred to the plaintiff. If they had taken the water through a ditch of their own construction the law would pronounce it a tort, and we do not perceive wherein it is any less a wrong.

because they bring it to their mill by a canal owned by other parties, even if the owners of the canal permit them to use it for such purpose.

From the best consideration we have been able to give this cause, we conclude that the judgment of the court below should have been for the plaintiff, and as all the facts in the case are admitted, as well as the amount of damages annually sustained, no good reason exists for remanding the cause.

It is admitted that the diversion of the water had continued for two years up to the time of trial, which was May 26th, 1880. The suit had then been pending for one year, leaving one year during which the damages can be recovered in this suit. As the damages have been admitted to be from $800, to $1,000, yearly, we think the plaintiff should recover for at least the lesser sum.

The judgment of the court below will be reversed, and a judgment entered in this court in favor of the plaintiff below and against the defendants below, for said sum and costs of this court, with execution for the collection thereof.

Judgment accordingly.